UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

───────────────────────────────x

UNITED STATES,                              21 CR 639 (PKC)

      v.

JUAN FELIPE RODRIGUEZ

                  Defendant.

───────────────────────────────x

## SENTENCING MEMORANDUM
## ON BEHALF OF JUAN FELIPE RODRIGUEZ

June 11, 2024

Gary M. Kaufman, Esq.
The Law Office of Gary Kaufman, PLLC
377 Broadway, 8th Floor
New York, NY 10013
Phone: (347) 855-9102
Fax: (212) 202-7949
gary@garykaufmanlaw.com
*Attorney for Juan Felipe Rodriguez*

<u>**PRELIMINARY STATEMENT**</u>

The defendant, Juan Felipe Rodriguez, respectfully submits this memorandum in support of his request for a custodial sentence of thirteen months of incarceration. The defense submits that a relatively short period of incarceration is sufficient, but not greater than necessary, to meet all of the sentencing factors set forth in 18 U.S.C. § 3553(a) when due consideration is given to the fact that Mr. Rodriguez has spent almost the entirety of his life as a law abiding citizen, focused on family and developing legitimate sources of income; the short amount of time that Mr. Rodriguez was involved with narcotics and the limited role that he played in the instant conspiracy; the difficult circumstances of his youth, in the wake of his father's murder, when he was constantly being shuffled back and forth between the United States and Columbia, and felt an obligation to provide for his family as its sole male member; and his genuine remorse and conduct since participating in the instant offense, which demonstrates his willingness to accept responsibility for his actions, such that there is a substantial likelihood that he will live a law-abiding life in the future. Mr. Rodriguez's close relationship to his family, and his demonstrated ability to provide for himself through lawful means, show that his conduct, in the instant matter, represented an unfortunate and serious mistake, and not a way of life, and mitigates the need for this Court to impose a significant prison sentence, which is greater than necessary to accomplish the goals of 18 U.S.C. § 3553(a)(2).

## I.    <u>BACKGROUND</u>

Juan Felipe Rodriguez had a tumultuous childhood, after his father was murdered when he was only three years old, forcing to family to continuously relocate between Miami, Florida and Medellín, Columbia. In spite of this, Mr. Rodriguez lived a life free of criminality, making

personal sacrifices to help care for his mother and two older sisters. He dropped out of school and began to work a series of legitimate jobs to earn a living and help provide for his family.

Without a father, Mr. Rodriguez looked to other male figures to help guide his future aspirations and ambitions. He worked and relocated, in part, to work with his uncle in financial services in Mexico. Mr. Rodriguez looked to expand his knowledge and earning power in investing, by entering the cryptocurrency market. In 2021, he saw an acquaintance who was trading in cryptocurrency and was eager to learn from him. Unfortunately, while unknown to Mr. Rodriguez at the time he began to work with this individual, this person was also involved in narcotics, and Mr. Rodriguez got swept up into helping out with a test-run for a plan to send a larger quantity of narcotics to the New York metropolitan area, flying to the New York/New Jersey area and reporting back to this individual, as well as taking direction from him. Aside from a few phone calls afterwards, Mr. Rodriguez had minimal involvement in the larger shipment of cocaine, and at that time was focused on the care of his future in-laws, as they were stricken with the COVID-19, which would take his future mother-in-law's life.

By the time he was arrested, Mr. Rodriguez was still working legitimately as a financial advisor and engaged to be married to a medical doctor. As he described in his letter to the Court, attached as Exhibit 2, he continued to feel guilty about his involvement in the transportation of cocaine, two-and-a-half-year priors, and when he was approached by law enforcement, while traveling in Columbia, he surrendered, paid for his own transportation to the United States, and immediately began the process of taking responsibility for his past actions.

The reality is that the offense for which Mr. Rodriguez stands convicted does not define him, and represents an aberration in his life. To view Mr. Rodriguez only through the prism of this offense, would ignore the aim of sentencing, which is to view the entire person, in order to

find a sentence that is "sufficient, but not greater than necessary" based on both the facts of the case and the person behind the crime.  When this information is balanced under the factors laid out in 18 U.S.C. § 3553(a), it reveals an appropriate sentence of thirteen months of incarceration, which, while below the advisory guideline range of 70 to 87 months, will still significantly punish Mr. Rodriguez, who has never before been in an incarceratory setting, while acknowledging his low risk of recidivism, and the generous, charitable, and responsible person his family and friends describe in their nineteen letters to the Court.

### A. <u>Juan Felipe Rodriguez's Personal History</u>

#### 1. <u>Childhood</u>

Juan Felipe Rodriguez was born on December 18, 1993 in Miami, Florida.  He was the third, and youngest, child, and only son born to the marriage of Juan Pablo Rodriguez and Clara Yepes.  (Presentencing Report "PSR" ¶ 44)[1].  Mr. Rodriguez's parents were natives of Columbia, but were living in Miami during the very early part of Mr. Rodriguez's life, with Mr. Rodriguez's two older sisters Paula and Daniella. In these early years, the Rodriguez family enjoyed relative affluence, as the elder Mr. Rodriguez worked in the financial services industry and owned an automobile dealership.  *Id.*  When Mr. Rodriguez was only three years old, his parents decided to relocate their family back to their hometown of Medellín, Columbia, for the elder Mr. Rodriguez's business opportunities. (PSR ¶ 46).  The Rodriguez family settled on a horse farm on the outskirts of the city and began to live what appeared to be an idyllic life.

---

[1] At the time of this writing, defense counsel has not yet been provided with the final version of the Presentencing Report.  Therefore, all citations relate to paragraphs in the draft report.

Tragically, less than one year after returning to Columbia, the lives of the Rodriguez family were shattered, when Mr. Rodriguez's father was kidnapped and murdered.[2]  Although Mr. Rodriguez was unaware that his father was murdered until he was fourteen years old, and was under the impression that his father was killed in an automobile accident, this did not minimize the impact that this event had on Mr. Rodriguez's life, who now, at less than four years old, was without a father.

The death of Mr. Rodriguez's father marked a significant turning point for his family. After the death of the elder Mr. Rodriguez, the family finances turn a significant downward turn, as Ms. Yepes struggled to provide for her son and two daughters.  Ms. Yepes received help from her late husband's two brothers, but this was not enough to provide a comfortable life for her children, such that when Mr. Rodriguez was seven years old, Mr. Yepes sent her three children to live with her late-husband's mother in Miami, Florida. As a result of this, Mr. Rodriguez and his sisters were only able to see their mother, in-person, twice a year, on visits to Columbia. (PSR ¶¶ 46, 47).  Although still a young child, Mr. Rodriguez was no longer with either of his parents.

The remainder of Mr. Rodriguez's youth lacked stability as he and his sisters moved back and forth from Miami, Florida to Medellín, Columbia four more times by time Mr. Rodriguez was sixteen.  The Rodriguez family's life straddled two continents as Ms. Yepes worked to

---

[2] As he was only three years old at the time, Mr. Rodriguez is unfamiliar with all of the circumstances of his father's death and who bears responsibility for it.  However, in the 1990's the Medellín based cartel of Pablo Escobar Gaviria, began a campaign of kidnapping members of affluent families. See, *Cocaine Ring's Latest Campaign: Kidnapping Wealthy Columbians,* NY Times, James Brooke, January 7, 1990 https://www.nytimes.com/1990/01/07/ world/cocaine-ring-s-latest-campaign-kidnapping-wealthy-colombians.html (last accessed June 9, 2024); *Medellín Journal: In Columbia's Tortured City, Elite Lives in Fear,* NY Times, James Brooke, January 9, 1991 https://www.nytimes.com/1991/01/09/world/medellin-journal-in-colombia-s-tortured-city-elite-lives-in-fear.html (last accessed June 9, 2024).  Although Mr. Escobar was killed in 1993, Mr. Rodriguez reports that these types of kidnappings were still known to occur at the time of his father's death in 1997.

balance her children's financial well-being, the desire of all of them to be together, and complications with Ms. Yepes' immigration paperwork. (PSR ¶¶ 48, 49). At times, when the Rodriguez children were in Miami, there were no parental figures, and the three siblings lived together in an apartment rented by Mr. Rodriguez's eldest sister, Paula.

Despite this instability, and maybe because of it, Mr. Rodriguez, his sisters, and his mother built an extremely close relationship. The Rodriguez family dynamic is summed up well by Mr. Rodriguez's sister's boyfriend, Arturo Rodriguez,[3] in his letter to the Court, attached as Exhibit 3, which states:

> Since joining this family recently, I have noticed how incredibly close-knit they are. In this all-female family, Juan is the only man, surrounded by his mother, his fiancé, two sisters, and two nieces. It is inspiring to see how they work together to maintain a strong family unit and unconditionally support each other. As I learn more about this family, I realize how fortunate I am to be a part of it and witness so much love and commitment among its members.

Ms. Yepes, in her letter (Exhibit 4)[4] described raising her children "with principles, values, justice, and duties to his family and society."

Mr. Rodriguez's Aunt Christina Rodriguez observed, as stated in her letter to the Court, attached as Exhibit 5, that despite the love from his nuclear and extended families, "the absence of his father since he was a little boy left a great void in his life." This tragedy, and the instability that followed, forced Mr. Rodriguez to grow up faster than his similarly aged peers. As he states in his letter to the Court (Exhibit 2), after his father died, "growing up for me was all about taking care of my mother and my two sisters, I have always thought that they are my responsibility and that I am their support." When he was young, he provided this support by

---

[3] No blood relation.
[4] Ms. Yepes' letter to the Court, as well as several others, were written in Spanish. These letters were translated by Criminal Justice Act (CJA) approved interpreter J. Carlos Venant. Both the original letters and the English translation are included with this Sentencing Memorandum.

exhibiting model behavior. As his Aunt Christina Rodriguez observed, "he was always a well-behaved child, friend, good companion, and one who was generous with everyone, as well as a good student." (Exhibit 5). Mr. Rodriguez's sister Daniella, described her brother as a rule follower, who pushed against her instincts to skip school or go out at night. (Exhibit 6). She said he was "always the responsible one, never wanting to do anything wrong." Mr. Rogriguez's mother said that "[a]s a child and an adolescent, he was very organized, obedient, and endowed with good judgment. He stayed far away from the things other young people do and use: tattoos, cigarettes, earrings, drugs, alcohol, and any other of those things habitual in the young, of which I am very proud." (Exhibit 4).

As he got older, Mr. Rodriguez's feeling of responsibility for his family extended beyond good behavior, respect, and the exhibition of love. In his teen years Mr. Rodriguez felt an obligation to help his family with their financial struggles. Because of this, Mr. Rodriguez dropped out of school in the 11th Grade, and began working at a chef for $12 an hour, to help his mother with household expenses, sacrificing his future with a high school diploma, for the well-being of his family. (Exhibit 2 and PSR ⁋⁋ 61, 71).

## 2. Juan Felipe Rodriguez's Early Adulthood

After leaving high school Mr. Rodriguez spent close to nine years working different jobs in the food services industry, usually as a chef or cook. (PSR ⁋⁋ 68-71). He supplemented his income as an Uber driver, so that he would have enough income to provide for himself and contribute to his family members. (PSR ⁋ 67). At points he lived in Columbia, where he attended culinary school, and Mexico, where he lived with his paternal uncles, as he was learning to make his way in the world without the guidance of a father and a sense of obligation and responsibility towards his mother. (PSR ⁋ 49).

Mr. Rodriguez describes cooking as something he was passionate about.  (Exhibit 2).
Several members of his family mention his cooking in their letters to the Court, including his
Aunt Christina Rodriguez (Exhibit 5) and fiancé Paola Andrea Aluma Betancourt (Exhibit 7).
Mr. Rodriguez's childhood friend, Marlon Vasquez noted in his letter to the Court (Exhibit 8) the
caretaker role that Mr. Rodriguez maintained in his family and viewed his cooking for friends
and family as a demonstration of "his love for nourishing others."  Mr. Rodriguez used his
passion for cooking for more than financial gain and for those close to him.  As Mr. Vasquez
said, "Juan extended his generosity to the less fortunate by organizing initiatives to feed the
homeless in downtown Miami, reflecting his innate kindness and empathy." *Id.*

Despite Mr. Rodriguez's love of cooking, the difficult hours kept him away from the
family he was so close to.  In his letter (Exhibit 2), he explains that he decided to turn his
professional aspirations in a different direction, in the belief that he possessed a high business
acumen.  He took and passed exams to obtain licenses needed to going into the financial services
industry, like his father and Mexico-based uncles before him, and began to seek opportunities in
that field and expand his knowledge of securities trading and cryptocurrency.  *Id.*

At about the same time Mr. Rodriguez was embarking on a change in his professional
life, in 2019, he was going through significant changes in his personal life.  At that time, his
four-year relationship, and two-year marriage, to Ana Maria Suarez, was ending.[5]  Shortly after
this separation, Mr. Rodriguez met Columbian physician Paola Aluma Betancourt through
mutual friends on social media. (Exhibit 7).  Within months Mr. Rodriguez moved to Columbia

---

[5] The divorce was not finalized until 2023.

to be with Dr. Aluma, and had been in a committed relationship with her ever since. They are engaged to be married. *Id.*

Shortly after Mr. Rodriguez relocated back to Columbia the COVID-19 pandemic began and Mr. Rodriguez started to work, remotely, for his uncle, Carlos Rodriguez's, Mexico based financial services firm, CAI Group, as a financial advisor. (PSR ⁋ 66). He provided comfort and companionship in support to Dr. Aluma as she risked her own safety to provide medical care in the early days of the pandemic. (Exhibit 7).

### B. The Instant Offense

Prior to leaving Miami in late 2019, at the same time as Mr. Rodriguez was attempting to transition from the food services industry into financial services, he connected with an individual referred to a "CC-1" in the PSR. CC-1 was involved in the trading of cryptocurrency. As Mr. Rodriguez describes in his letter (Exhibit 2), he began to work with and learn how to trade cryptocurrency with this individual. He continued to do this after moving to Columbia to be with Dr. Aluma in late 2019, while he was also working for CAI group. Mr. Rodriguez was not made aware that this person was involved in any illegal activity until 2021, when a meeting he thought was related to cryptocurrency, was actually about the transporting cocaine for sale to the New York/New Jersey area. At this point, Mr. Rodriguez felt that "everything escalated so fast and it was to[o] late when I was involved in their meetings and doing stuff for them." (Exhibit 2).

In his letter Mr. Rodriguez does not make excuses for his conduct related to the drug conspiracy he was brought into and, in fact, explicitly states, "I am not making excuses for my actions. I will face the consequences of my decisions with responsibility." *Id.* Dr. Aluma, his

fiancé, feels that she sees an aspect of Mr. Rodriguez's personality that led to his involvement. She says that Mr. Rodriguez is someone who "always tries to help anyone he can, who has blind trust in people, and expects nothing in return; his heart is so noble that sometimes people just take advantage of him." (Exhibit 7). Mr. Rodriguez's trusting nature can begin to provide some explanation as to how he continued to work with CC-1, and assisted him in a narcotics deal, even when it became clear what he was involved with.

The instant offense conduct involved two shipments of cocaine to the New York/New Jersey area. The first of which, was considered a test-run and involved 10 kilograms of cocaine, while the second shipment involved 100 kilograms of cocaine. Mr. Rodriguez participated in the first 10-kilogram shipment, on CC-1's behalf, attending meetings, observing actions on the ground, and reporting back to CC-1. (PSR ¶¶ 12-14). Mr. Rodriguez did not have any decision-making authority and simply followed CC-1's direction. He did not personally handle any cocaine. He participated in the conspiracy for the promise of a position in CC-1's cryptocurrency company, and was ultimately paid $5,000. Once the test-run was complete, Mr. Rodriguez returned back to Columbia, and took no further actions to advance the conspiracy beyond the placement of some phone calls. Although Mr. Rodriguez was aware that a second, much larger, shipment would be coming, and did not formally exit the conspiracy, he was not involved with that shipment. (PSR ¶¶ 16-18, which describe the larger shipment, do not mention Mr. Rodriguez). By the time of the second shipment, Mr. Rodriguez was fully consumed by the dire situation around the COVID-19 diagnosis of Dr. Aluma's parents, which ultimately took her mother's life. (Exhibit 7).

### C.  **Juan Felipe Rodriguez's Post-Offense Conduct**

Shortly after returning back to Columbia, with the exception a several phone calls, Mr.

Rodriguez ceased illegal activity and continued his work with CAI Group.  However, his focus

shifted as Dr. Aluma's parents became seriously ill with COVID-19.  He once again took on a

caretaker role for his loved ones.  Dr. Aluma describes the comfort and assistance she received

from Mr. Rodriguez in the time leading up to her mother's passing.  As she stated, Mr.

Rodriguez "stayed up all night with me, if what was called for was to come out running because

of some unexpected change, he was willing to be by my side.  He took care of my parents' house

while my sister and I were in the clinics because they were both hospitalized simultaneously."

(Exhibit 7).  Dr. Aluma's sister Lina Maria Aluma Betancourt, similarly describes her gratitude

towards Mr. Rodriguez during that difficult time.  She states that "you can't imagine how much

Juan Felipe did for us during that time.  We did not lack for anything.  His family took me in as

if I were one more daughter, and they gave me all the love in the world to fill even a bit of the

huge void that the sudden absence of my mother had created."  (Exhibit 9).

After Dr. Aluma's mother passed away, the couple relocated to Huixquilucan, Mexico in

August, 2021, to allow Dr. Aluma the space she needed to mourn, and so that she could study in

the best aesthetic medicine school in the Spanish speaking world.  (Exhibit 7).  This also enabled

Mr. Rodriguez to be closer to his uncle and CAI Group, where he furthered his career as a

financial advisor.  (PSR ‖ 66).  The couple have been living there with their four dogs and have

integrated their extended families with each other's.  (Exhibit 7).  Mr. Rodriguez hopes to

someday have children of his own with Dr. Aluma.  (Exhibit 2).

In the two and a half years between his short involvement with the conduct in this case

and his arrest, Mr. Rodriguez has reflected on his actions and has harbored a guilty conscience.

He states in his letter, "I want you to know Judge Castel that this feeling of remorse it's not recent and it's not because I'm here today. I have been carrying this feeling for years, the years I've been far from my family and that they have suffered because of me, since the day I understood the damage I was doing to this country and how many people I was hurting." (Exhibit 2).

Mr. Rodriguez's feelings of remorse are evident in the actions he has taken since he was approached by police while visiting Columbia, and the speed with which he has resolved his case. When he was told that the Drug Enforcement Agency was looking for him, he voluntarily surrendered to them in Bogota, Columbia the following day. (PSR ¶ 21). He purchased his own ticket to come to the United States the following day to answer for his conduct. In less than three weeks, he ███████████████████████████████ less than two months later pled guilty to the charge against him. (PSR ¶ 4). He will be sentenced less than five months after he was approached by law enforcement in Columbia, taking quick accountability and saving the Government the expense of prosecuting him.

In the time since his arrest, Mr. Rodriguez has been housed at MDC Brooklyn, where he has not been subject to any disciplinary infractions. As his fiancé describes, he has spent his time incarcerated reading, focusing on books about personal growth. (Exhibit 7). He has maintained close contact with family, who visit him monthly from Miami. As observed by his oldest sister Paula, Mr. Rodriguez has shown he that he is still "an exceptional individual with a strong moral compass and commitment to making amends for his actions. He has demonstrated remarkable growth and a willingness to learn from his mistake." (Exhibit 10) His other sister, Daniella, has seen her brother demonstrate "a remarkable level of maturity throughout this process" and has noted the shame that the entire family feels for Mr. Rodriguez's actions.

(Exhibit 6)  Mr. Rodriguez's cousin Camilo Rodriguez has similarly observed that "[h]e has expressed deep remorse and regret for his actions, acknowledging the mistakes he made.  Juan has shown a sincere desire to make amends and grow from this experience.  His humility and willingness to accept responsibility are indicative of his true character."  (Exhibit 11).

## II.    THE COURT SHOULD IMPOSE A THIRTEEN MONTH SENTENCE WELL BELOW THE GUIDELINES RANGE CALCULATED IN THE PSR

### A.  Introduction

The Presentencing Report ("PSR") at ¶¶ 35 and 77, after downward adjustments for Mr. Rodriguez' acceptance of responsibility, calculated an advisory United States Sentencing Guidelines ("Guidelines") adjusted offense level of 27 for Juan Felipe Rodriguez, which has an advisory guidelines range of 70-87 months at Criminal History Category I.  This offense level was calculated based on: a base offense level of 34 for Drug Offenses where cocaine weight was between 50 kilograms and 150 kilograms pursuant to U.S.S.G. § 2D.1.1(c)(3): ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮; a two-level reduction as since Mr. Rodriguez has zero criminal history points and otherwise meets all of the criteria under U.S.S.G. § 4C1.1(a); and a 3-level reduction for acceptance of responsibility.  Objections to the first draft of the PSR are relatively minimal, and are attached as Exhibit 1.[7]

---

[8] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[7] Since this memorandum is being drafted prior to the receipt of the final draft of the PSR, it is unclear whether or not probation has or will accept the defense's proposed changes.

Mr. Rodriguez does not contest the amount of narcotics attributed to him by the guidelines, as they were reasonably foreseeable to him, when he participated in the 10-kilogram test-run in this case.  Defense counsel notes, however, that if Mr. Rodriguez were only held responsible for the cocaine, whose transportation and sale he directly participated in, his base level would be 30 rather than 34, with an ultimate guideline level of 23 and a range of 46-57 months before the application of any variance.  Further, the law-abiding life Mr. Rodriguez led before and after his brief participation in the instant conspiracy in spite of difficult circumstances, his willingness to accept responsibility for his actions, and likelihood of living a productive law-abiding future, should lead to a greatly reduced sentence after the application of 18 U.S.C. § 3553(a)[8].  Consideration of these factors fully supports a significant downward variance from the advisory guideline range the Court determines are applicable in this case.

### B.  Consideration of the 18 U.S.C. § 3553(a) Factors Fully Support a Sentence Well Below the Guideline Range Calculated in the PSR

Suffice it to say that the Guidelines are advisory, that the Court must consider all of the factors enumerated in 18 U.S.C. § 3553(a), *Rita v. United States*, 551 U.S. 338, 351 (2007), and that the Guidelines are only one factor to be considered in determining Juan Felipe Rodriguez's sentence, and which are entitled to no greater weight than the other factors outlined in 18 U.S.C. § 3553(a).  *Gall v. United States,* 552 U.S. 38 (2007); *Kimbrough v. United States*, 552 U.S. 85 (2007).   As was clearly stated by Justice Scalia, in his concurring opinion in *Kimbrough*, 552 U.S. at 114, there can be no "thumb on the scales" in favor of Guidelines sentences.  Further, the Guidelines sentencing ranges are not cloaked in any presumption of reasonableness.  *See, Gall,*

---

[8] In making these, and the foregoing, legal arguments, Mr. Rodriguez is not seeking to avoid responsibility for his crimes.  The decision to raise these and all prior legal arguments is counsels' and reflects counsels' efforts to represent his client effectively and to advance arguments, which in counsel's view, have merit.

552 U.S. 38 (2007).  *See also Nelson v. United States*, 555 U.S. 350, 351 (2009).  Sentencing

must be individualized for each defendant.  "While there are many competing considerations in

every sentencing decision, a sentencing judge must have some understanding of the diverse

frailty of humankind…what it is like to be in trouble and in pain."  *United States v. Singh*, 877

F.3d 167, 172 (2d Cir. 2017).   In making such a determination, a judge is not prohibited from

including in that determination, the judge's own sense of what is a fair and just sentence under

all of the relevant circumstances.  Further, as one district judge noted, "the Guidelines may be

tempered by compassion."  *United States v. Kloda*, 133 F. Supp. 2d 345, 349 (S.D.N.Y. 2001)

(Hellerstein, J.).

     In this case, the 18 U.S.C. § 3553(a) factors all support a below Guidelines sentence for

the following reasons: (1) Juan Felipe Rodriguez's history and characteristics show a man who,

despite being raised under challenging and unstable circumstances, lived a life focused on

family, responsibility, and lawful work, who became involved with narcotics briefly after his

attempt to grow professionally in a legal manner took an unexpected turn; (2) a man whose focus

has been on the well-being of others and feels genuine remorse for his conduct; and (3) an

individual who has a wealth of positive qualities, that he has applied, even prior to his arrest,

which demonstrate the instant conduct to be an aberration, such that he is likely to lead a

productive and law-abiding life in the future.

    1.   The 18 U.S.C. § 3553(a)(1) Factors, Which the Court Must Consider,
        Support a Below Guidelines Sentence

        i.    The Nature and Circumstances of the Offense Supports a Below-
            Guidelines Sentence for Juan Felipe Rodriguez

The conspiracy charged in the instant matter involved the coming together of various individuals to arrange for the importation and transportation of 123 kilograms of cocaine into the New York/New Jersey area, and its subsequent sale.  This consisted of a test-run of 10 kilograms of cocaine and a later larger shipment of 100 kilograms of cocaine.  Mr. Rodriguez did not plan any elements of the conspiracy, did not introduce buyers to sellers or sellers to buyers, did not personally transport, sell, or handle narcotics, and did not profit, more than a one-time payment of five thousand dollars.  He simply monitored, delivered messages, and reported back the actions of the more significant players to and from one of the architects of the conspiracy, during the test run.  He was deemed unimportant enough to not participate in the larger shipment, and his non-participation seemingly had no effect on its success.  He got involved in a conspiracy, outside of his character, in the hope it would help him land a job trading cryptocurrency, in a coconspirator's legitimate business.  After completing his role in the conspiracy, Mr. Rodriguez went back to his law-abiding life.

In the instant matter, although Mr. Rodriguez understood that the task that he performed was part of a larger conspiracy, and that a 100 kilogram shipment was planned to follow the 10 kilogram shipment that he played a role in, such that the Guidelines reflects the full 50 to 150 kilograms of cocaine involved in the conspiracy, it is worth noting that if Mr. Rodriguez was only held accountable for the narcotics he played a more active role in, he would have a base offense level of 30, rather than 34 under U.S.S.G. § 2D.1.1(c)(5) for offenses involving 5 to 15 kilograms of cocaine, which would result with an ultimate guideline level of 23 and a range of 46-57 months, before accounting for other factors.

Mr. Rodriguez's relatively limited role in the instant offense for only the smaller portion of the offense supports a sentence well below the advisory guidelines range calculated in the PSR.

ii.  Juan Felipe Rodriguez's History and Characteristics Support a Below-Guidelines Sentence

18 U.S.C. § 3553(a)(1) requires a sentencing court to consider the history and characteristics of the defendant when imposing a sentence.  The sentencing judge "has a greater familiarity [than the Sentencing Commission] with the individual case and the individual defendant before him … [and] is therefore in a superior position [than the Sentencing Commission] to find facts and judge their import under 3553(a) in each particular case." *Kimbrough*, 522 U.S. at 108.  In imposing sentence, we ask the Court to view Mr. Rodriguez as more than just a participant in a narcotics conspiracy, but to look deeper at the hard-working, generous, family-oriented man that he is, and his demonstrated ability to live a life free of criminality both before and after he became involved in the instant case, despite the difficult circumstances of his youth, along with his commitment to living a productive law-abiding life in the future.

As discussed *supra* on pages 4-8, Mr. Rodriguez grew up fatherless, with the instability of continuously being relocated from Florida to Columbia and back again, often in the care neither parent.  In spite of this, aside from the instant offense, Mr. Rodriguez has spent his life steering clear of the criminal justice system.  He devoted his whole self to taking care of the women in his family, whether they be his sisters, mother, fiancé, or future in-laws.  But for being led astray while trying to advance his professional career in the financial services industry and cryptocurrency, he would not have found himself involved in the instant case.  Even so, Mr.

Rodriguez's involvement was limited in time and scope and he did not actively participate in the conspiracy's primary shipment of cocaine.  Mr. Rodriguez has proven that he is not a risk of recidivism, since he ceased his criminal behavior well before he was arrested.  As soon as he surrendered to authorities, he, remorsefully, took ownership of his past wrongs and has worked to resolve his case in record time.  There should be no doubt that he will continue on the law-abiding and productive trajectory he was on before and after he became involved in the instant matter.

Additionally, case law recognizes that one's family circumstances may provide the basis for a Guidelines variance and may ameliorate, in particular cases, the harshness of the Guidelines.  *See, United States v. Chase*, 560 F.3d, 828, 831 (8th Cir. 2009).  Mr. Rodriguez shares an extraordinarily close relationship to his family, who despite residing in Florida, have made it a point to visit him at MDC Brooklyn monthly and to attend his court dates.  It is no doubt why his family remains by his side, as letters of support consistently describe Mr. Rodriguez as generous, responsible, respectful, loving, hard-working, and full of optimism of joy.  His is so highly regarded by friends and family, many of whom have expressed their disapproval, shame, and surprise at the criminal conduct in this matter, that he received nineteen, thoughtful, letters of support.  Many of these letters are cited above.  Additional letters, which are no less heartfelt than those previously mentioned are attached as Exhibit 12.  Photographs of Mr. Rodriguez with his loved ones are attached as Exhibit 13.  As Mr. Rodriguez makes clear in his letter, and his family has observed, he has genuinely learned from his mistake.  This Court should impose a relatively brief sentence of incarceration, in the realm of thirteen months, so that, as Mr. Rodriguez puts it, (Exhibit 2), like a phoenix, he "can be reborn from the ashes [and be given] and opportunity to be a better person everyday."

2. <u>A Below-Guidelines Sentence of Thirteen Months is Sufficient, But Not Greater than Necessary to Satisfy the Purposes of Sentencing Set Forth in 18 U.S.C § 3553(a)(2)</u>

18 U.S.C. § 3553(a) requires a sentencing court to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." Paragraph (2) specifies that the Court must consider:

> "the need for the sentence imposed − (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."

These purposes in this case all would be satisfied by a well below-Guidelines probationary sentence.

Generally speaking, "[d]eterrence, incapacitation and rehabilitation are prospective and societal − each looks forward and asks: What amount and kind of punishment will help make society safe?  In contrast, retribution imposes punishment based on moral culpability and asks: What penalty is needed to restore the offender to moral standing within the community?"  *United States v. Cole*, 662 F. Supp.2d 632, 637 (N.D. Ohio, 2008).  In the instant case, each of these purposes is served by a thirteen-month sentence far below the Guideline range calculated in the PSR.

i.    <u>A Below-Guidelines Sentence of Thirteen Months is Sufficient to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense</u>

A lengthy sentence of incarceration is not necessary to reflect the seriousness of the offense while providing a punishment that is just when taking into account the facts and

circumstances of the instant offense, and the fact that this offense remains and outlier in Mr. Rodriguez's life.

Beyond having never previously been deprived of his freedom, Mr. Rodriguez has been incarcerated at MDC Brooklyn during the pendency of his case, a notoriously harsh place to be confined.  As the Honorable Jesse M. Furman, noted earlier this year in *United States v. Gustavo Chavez,* 22 Cr. 303 (JMF), pgs. 9-10 (January 4, 2024):

> The conditions at the MDC are dreadful in many respects, but three warrant particular emphasis. First, inmates at the MDC spend an inordinate amount of time on "lockdown" — that is, locked in their cells, prohibited from leaving for visits, calls, showers, classes, or exercise. (In Orwellian fashion, the Bureau of Prisons does not refer to these periods as "lockdowns"; instead, it refers to them as "modified operations." See Bureau of Prisons, Annual PREA Report CY 2022 (2023), at 1-2. But there is no mistaking what the practice entails.) As of the date of this Opinion and Order, inmates at the MDC have reportedly been on lockdown for much or all of the last three weeks following an assault on staff, with a maximum of "two hours outside their cells each day" during a short reprieve. Def.'s Letter 2, United States v. Zeitlin, No. 23-CR-419 (LAK) (S.D.N.Y. Jan. 2, 2024), ECF No. 58; see also Dec. 2023 Mem. for Inmate Population from Captain Rodriguez, Zeitlin, No. 23-CR-419 (LAK) (S.D.N.Y. Jan 2. 2024), ECF No. 58-1. For far longer, lockdowns have been especially common on weekends and holidays. See Plea Tr. 38-39 ("[P]eople who are detained at the MDC are not allowed out of their cells pretty much at a minimum three days of the week, Friday, Saturday, Sunday . . . ."). One defendant who kept a log of these lockdowns recently reported that he had been "locked down for 137 of [the] 245 days" he was detained at the MDC, or "more than 50% of his time at the facility." Sentencing Mem. at 7, United States v. Jacobs, 23-CR-413 (VB) (S.D.N.Y. Nov. 7, 2023), ECF No. 25.

This has, in fact, been the reality of Mr. Rodriguez's confinement at MDC Brooklyn.  Mr. Rodriguez created a chart, attached as Exhibit 14, which details the hours he was allowed to leave his cell each day and demonstrates that there has been at least a partial lockdown during a large percentage of the days he has been held at MDC Brooklyn.

In addition to lockdowns, Judge Furman also observed:

> Second, the MDC is notoriously and, in some instances, egregiously slow in providing necessary medical and mental health treatment to inmates — especially where such care requires the attention of outside providers. *See, e.g.*, Women in Prison Comm., Nat'l Ass'n of Women Judges, Second Visit to BOP's Metropolitan Detention Center (MDC), Brooklyn, New York 2 (2016) (finding that inmates at the MDC were denied essential gynecological care). It has become common for defense counsel to require court intervention to ensure that inmates receive basic care — and, even more shocking, not uncommon for court orders to go unheeded. In one recent case, for example, the MDC repeatedly defied court orders to transfer a defendant with a MRSA infection to a medical facility; the defendant was instead "mistake[nly]" sent to the segregated housing unit. *See* Dec. 15, 2023 Hr'g Tr. at 3-5, 17, *United States v. Young*, No. 23-CR-475 (DLI) (E.D.N.Y. Dec. 15, 2023). … And in yet another, it was the "position of MDC legal" to defy a court order "to provide the defendant with a special diet . . . appropriate for . . . diabetes." Conf. Tr. at 3, 9, *United States v. Palos-Garcia*, No. 21-CR-340 (JGK) (S.D.N.Y. Jan. 5, 2022), ECF No. 57.

*Id* at 11-12. The last example given by Judge Furman was not dissimilar to Mr. Rodriguez's own situation. As his medical records, selections of which are attached as Exhibit 15[9], reflect, although Mr. Rodriguez initially appeared and was detained in the instant matter on January 30, 2024, he was not evaluated by medical staff until February 6, 2024, one week later. ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

████████ (Defense counsel's emails to the legal department at MDC Brooklyn are included as Exhibit 16). ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████

A district court judge can grant sentencing relief based upon unduly harsh conditions of confinement. *See United States v. Carty,* 264 F.3d 191, 196 (2d Cir. 2001) (remanding for

---

[9] Mr. Rodriguez's entire medical record from MDC Brooklyn can be provided upon request.

consideration of downward departure in light of pre-sentence detention condition in the
Dominican Republic). The court may consider the confinement conditions that a particular
defendant is likely to encounter after sentencing, *Koon v. United States*, 518 U.S. 81 (1996), and
conditions that a defendant previously suffered. *See, United States v. Francis*, 129 F.Supp.2d
612, 616-619 (S.D.N.Y., 2001) (granting downward departure to defendant who spent thirteen
and one-half months at an in-state facility where defendant was subject to substandard
conditions."). There is precedent for granting a variance for conditions of confinement in the
local federal jails. As one example, in February, 2019, Judge Jesse M. Furman of the Southern
District of New York, granted a variance after a winter power outage in MDC led to a situation
where for more than a week, inmates were trapped in dark, freezing cold cells, without hot water.
They had no access to legal or social visits. *United States v. Ozols,* 16 Cr. 692 (JMF). This
Court should likewise account for the awful conditions at MDC, as they relate to Mr. Rodriguez
in fashioning his sentence.

Furthermore, Mr. Rodriguez will suffer a lifetime of collateral consequences which result
from a felony conviction, and which equate to a lifetime of punishment. *United States v.
Nesbeth,* 188 F.Supp.3d 17 (E.D.N.Y. 2016) (reviewing the national collateral consequences that
flow from a felony conviction and concluding that there are 1,200 collateral consequences which
federal law imposes). For example, Mr. Rodriguez's ability to earn a living, obtain government
subsidies, qualify for Section VIII housing, obtain student or other federal loans, will be limited
due to his felony conviction. Beyond the statutory collateral consequences, there exists the
prejudice encountered by felons from employers who refuse to hire them simply because of their
conviction. This is especially true for Mr. Rodriguez's whose ability to work in the financial
services industry will likely be affected because of difficulty maintaining and keeping licenses.

These collateral consequences—a lifetime of punishment even after release from incarceration—more than any term of imprisonment, send a very real message of deterrence to the community.

> ii.    A Below-Guidelines Sentence Would Not Encourage Criminal Conduct and is Sufficient to Protect the Public from Future Wrongdoing by Juan Felipe Rodriguez

Imposing the PSR's calculated Guidelines sentence would have little, if any, bearing on deterrence. Empirical research shows no relationship between sentence length and deterrence. "There is generally no significant association between perceptions of punishment levels and actual levels … implying that increases in punishment levels do not routinely reduce crime through general deterrence mechanisms." Gary Kleck, et al., *The Missing Link in General Deterrence Theory*, 43 Criminology 623 (2005). *See also, United States v. Lawrence,* 254 F.Supp.3d 441 (E.D.N.Y. 2017) (Weinstein J.), where the Court heard testimony from several experts in the field and reached the same conclusion that punishment levels do not reduce crime through general deterrence.

In addition to the ineffectiveness of overly lengthy terms of imprisonment on deterrence, an over-emphasis on general deterrence poses the ethical problem of punishing one person to promote the deterrence of others. "Judicial punishment can never be administered merely as a means for promoting another good either with regard to the criminal himself or to civil society, but must in all cases be imposed only because the individual on whom it is inflicted has committed a crime. For one man ought never to be dealt with merely as a means subservient to the purpose of another." Immanuel Kant, *The Science of Right* 195 (W. Hastie trans., 1790).

A lengthy prison sentence is also not needed in the instant case for specific deterrence. Mr. Rodriguez stayed away from criminality for nearly twenty-eight years prior to his involvement in the instant matter, and after brief involvement, returned to his law-abiding ways for two and a half year after, working as a financial advisor. Mr. Rodriguez has an understanding that he has brought shame on his family, through his poor decision making and has expressed genuine remorse to all who will listen, as seen in the many letters submitted on his behalf, in addition to his own letter to the Court, at Exhibit 2. Mr. Rodriguez is deterred.

      iii.   <u>A Below-Guidelines Sentence is Sufficient to Provide Juan Felipe Rodriguez with Needed Educational or Vocational Training, Medical Care, or other Correctional Treatment in the Most Effective Manner</u>

Mr. Rodriguez does not have any issues with mental health or drug abuse, and therefore is not in need of treatment. Nonetheless, Congress has directed that in considering whether and to what extent imprisonment is appropriate under 18 U.S.C. § 3553(a), a sentencing judge is required to "recogniz[e] that imprisonment is not an appropriate means of promoting correction and rehabilitation." *See* 18 U.S.C. § 3582. While Mr. Rodriguez still needs to finish the process of earning his G.E.D., he does not need to be in an incarceratory setting to do that.

      3.   <u>Imposing a Below-Guidelines Sentence on Juan Felipe Rodriguez Will Not Result in Unwarranted Sentencing Disparities</u>

18 U.S.C. § 3553(a)(6) requires courts to consider the need to avoid sentencing disparities amongst similarly situated defendants. However, defendants convicted of similar conduct may vary in culpability, risk of recidivism, dangerousness, and other variations which may justify different sentences for defendants involved in the same offense and which judges must also take into account. *Kimbrough*, 552 U.S. at 108 ("some departures from uniformity were a necessary cost of the remedy we adopted.") The Court is therefore not bound to sentence

two codefendants identically.  As the caselaw makes plain, sentencing requires an individualized determination as to each defendant. See, *Singh*, 877 F.3d at 172.

In the instant matter, Juan Felipe Rodriguez is the third defendant to be sentenced.  The two individuals sentenced before him, Pablo Jaramillo and Jesus Alejandro Elizondo Santos, were both sentenced below the advisory guideline range.  Mr. Jaramillo was sentenced to 48 months of imprisonment and Mr. Elizondo Santos was sentenced to 38 months of imprisonment. (PSR ⁋⁋ 7-8).  Mr. Rogriguez is a very different defendant than both Mr. Jaramillo and Mr. Elizondo Santos and significantly less culpable.

Pablo Jaramillo played a crucial role in the conspiracy, providing a place for the coconspirators to meet, and recruiting buyers to sell and distribute the cocaine to be brought to the New York/New Jersey area.  (PSR ⁋⁋ 11, 13). His involvement lasted for the length of the conspiracy, and as the Court noted when he sentenced Mr. Jaramillo, the case involved a drug operation that Mr. Jaramillo facilitated. Dkt. 35, pg. 9.  Mr. Rodriguez, unlike Mr. Jaramillo, did not recruit anyone to the conspiracy and did not provide any locations important to the conspiracy.  Rather he acted as the eyes and ears for a non-present coconspirator and delivered messages to and from him.  By the time of the large shipment, Mr. Rodriguez was essentially uninvolved.

Like, Mr. Jaramillo, Jesus Alejandro Elizondo Santos' role was more significant that Mr. Rodriguez. He personally loaded massive amounts of narcotics onto a truck for shipment.  While Mr. Elizondo Santos was primarily involved with the 100-kilogram shipment (PSR ⁋ 16), the shipment Mr. Rodriguez was involved in was one tenth the size.  Further, Mr. Elizondo Santos involvement continued after the 100-kilogram shipment as he helped to try to conceal the activities from law enforcement, by delivering a phone they would not detect.  (PSR ⁋ 18).  This

can be directly contrasted with Mr. Rodriguez, who aside from making a few phone calls was not involved in the conspiracy after the 10-kilogram test-run.

Mr. Rodriguez's relative culpability as to his codefendants, along with his lack of contact with the criminal justice system, and the honorable way he has lived his life, outside of the offense conduct, despite coming from difficult circumstances, merits a considerably lower sentence then either Mr. Jaramillo or Mr. Elizondo Santos, such as a sentence of thirteen months of incarceration.

## CONCLUSION

For all of the reasons set forth in this sentencing submission, Juan Felipe Rodriguez respectfully requests, on the facts of this case, and considering all of the sentencing factors applicable to him, that the Court sentence him to a custodial sentence of thirteen months of incarceration. Such a sentence is sufficient, but not greater than necessary, to achieve the purposes sent forth in 18 U.S.C. § 3553(a).

Dated:  June 11, 2024
      New York, New York

                                  Respectfully Submitted,

By:

                      _____/s/_____
                      Gary M. Kaufman, Esq.
                      Law Office of Gary Kaufman, PLLC
                      377 Broadway, 8th Floor
                      New York, NY 10013
                      347-855-9102
                      gary@garykaufmanlaw.com

                      *Attorney for Defendant Juan Felipe Rodriguez*

To:    Samuel P. Rothschild
        Assistant United States Attorney
        (Via email & ECF filing)

        Ashley E. Geiser
        U.S. Probation Officer
        (Via email & ECF filing)

# EXHIBIT 1

**THE LAW OFFICE OF GARY KAUFMAN, PLLC**
ATTORNEY AT LAW
377 BROADWAY
8th, Floor
New York, New York 10013
(347) 855-9102  FAX (212) 202-7949

May 31, 2024

<u>By E-mail</u>

Ashley Geiser
United States Probation Officer
U.S. Probation Department
500 Pearl Street
New York, NY 10007

Re: United States v. Juan Felipe Rodriguez, 21 Cr. 639 (PKC) (S7)

Dear Officer Geiser:

Counsel for Juan Felipe Rodriguez, hereby, writes to raise certain objections to the Pre-Sentence Investigation Report (PSR) prepared by the U.S. Probation Department, in the instant matter. Mr. Rodriguez raises the following objections pursuant to Rule 32(f)(1) of the Federal Rules of Criminal Procedure:

Page 2: This page currently states that Mr. Rodriguez does not have a State ID Number.  This is not correct.  Mr. Rodriguez has a Florida ID Number, contained on his driver's license, which was taken by law enforcement when he was arrested in the instant matter.

¶ 10: The word "organization" should be replaced with "conspiracy".  This case did not involve any formal organization, but was rather a loose agreement between individuals to play a role in the transportation and sale of cocaine.  Mr. Rodriguez did not know the vast majority of those involved prior to his coming to the New York/New Jersey area in May, 2021.

¶ 12: The first sentence should be changed to state that Mr. Rodriguez was predominantly based in Columbia, but often traveled to Florida to visit family.

¶ 14: A sentence should be added, which states that Mr. Rodriguez never, personally, handled any cocaine involved in this case, as this clarifies his role in relation to the narcotics at issue.

¶ 15: The first sentence should be changed to state that Mr. Rodriguez "continued to participate in the DTO, by making a few phone calls from Columbia."  This more accurately describes Mr. Rodriguez's location and the extent of his involvement after the initial test-run.

¶ 16: A sentence should be added which states that Mr. Rodriguez was not involved with this shipment, which accurately explains that Mr. Rodriguez role was limited to assisting in the initial test-run and making a few phone calls afterwards.

¶ 18: A sentence should be added which states that Mr. Rodriguez no longer involved with the conspiracy at this point, which accurately explains that Mr. Rodriguez role was limited to assisting in the initial test-run and making a few phone calls afterwards.

¶ 21: The phrase "and purchased his own ticket for $1,200 to travel to the United States to face the current charge" should be added to the end of the first sentence, as this more fully describes the circumstances of his arrest.

¶ 44: The third sentence should be changed to reflect that Mr. Rodriguez's father died when he was kidnapped and then murdered. A sentence should be added to state that until he was fourteen years old, Mr. Rodriguez was told that his father was killed in a car accident.

¶ 45: A sentence should be added to reflect that each of Mr. Rodriguez's sisters are divorced and each have a daughter; his two nieces.

¶ 46: The first sentence should be changed to reflect that Mr. Rodriguez's family moved to "Medellin" not "Medina," Columbia. The words "grew produce and" should be removed from the second sentence. While the family lived on a ranch with horses, which was common in Columbia, they did not grow produce. The words "killed in a motor vehicle accident" should be changed to "kidnapped and murdered" to accurately reflect the circumstances of Mr. Rodriguez's father's death.

¶ 47: The word "sister" at the end of the second sentence should be pluralized to "sisters," since extended family was needed to help provide for Mr. Rodriguez, his mother, and both of his sisters. The end of the third sentence should be changed to "but only saw her every six months when they visited Columbia to see her on vacations from school," as this more accurately reflects when the Rodriguez children saw their mother.

¶ 48: The first sentence should be changed to reflect that Mr. Rodriguez's family lived in "Medellin" not "Medina," Columbia. The words "by selling goods imported from Panama in the market" should be removed from the second sentence, as Mr. Rodriguez's mother had done that earlier in her life, not when Mr. Rodriguez was between the ages of nine and thirteen. At that time Mr. Rodriguez's mother worked as a pharmaceutical representative for Pfizer. A sentence to be added to state that, while Mr. Rodriguez lived in decent neighborhoods, he was exposed to drug use in his middle and high schools in Miami, which further explains his surroundings. The last sentence should be changed to reflect that Mr. Rodriguez returned to Columbia his sister Daniela, when he was fifteen, while his oldest sister, Paula, remained in Miami.

¶ 49: The first sentence should be changed to reflect that when Mr. Rodriguez returned to Miami at 16, his mother remained in Columbia. She finally joined Mr. Rodriguez and his siblings in Miami the following year, after which Mr. Rodriguez lived with his mother for one year, before moving out and living with a roommate. The second sentence should be changed to reflect the fact that Mr. Rodriguez returned to Columbia at 20, not 21. The third sentence should be changed to reflect that Mr. Rodriguez moved to Mexico at 21, not 22 and returned to Miami at 23, not 24. The last sentence should be changed to reflect that after living with his mother for a short time, Mr. Rodriguez lived by himself and with his ex-wife, Ana Maria Suarez.

¶ 51: Requested information about Mr. Rodriguez's ex-wife is as follows: Mr. Rodriguez married Ana Maria Suarez in Miami, Florida on January 9, 2017, after two years of dating. Mr. Rodriguez and Ms. Suarez separated in 2019, but did not finalize their divorce until 2023, when Ms. Suarez formally served divorce papers on Mr. Rodriguez. Mr. Rodriguez and Ms. Suarez's relationship ended because, after two years of marriage, they proved to be incompatible with each other and were no longer getting along. Ms. Suarez resides in Miami, Florida. At the time of her relationship with Mr. Rodriguez, she worked as a human resources administrator.

2

¶ 52: The first sentence should be changed to reflect that Mr. Rodriguez met Dr. Aluma online.

¶ 53: The first sentence should be changed to reflect that Mr. Rodriguez moved back to Columbia in 2019, in order to be with Dr. Aluma, who was also from Columbia and practicing medicine there.  While living in Columbia, Mr. Rodriguez traveled to Chile and Australia to learn about wine, with the hope of getting professionally involved in the wine making supply chain.  While living in Columbia, Mr. Rodriguez was working for his uncle's brokerage firm, CAI group, remotely.  The third sentence should be changed to reflect that Mr. Rodriguez and Dr. Aluma moved to Mexico for professional opportunities.  Both are of Columbian ancestry, and Dr. Aluma had previously lived in Columbia.  Mr. Rodriguez wanted to move to Mexico, so that he could work more closely with CAI Group, which was based in that country.  Dr. Aluma entered a program in Mexico, where she was able to specialize in aesthetic medicine.  Mr. Rodriguez and Dr. Aluma moved to Mexico in August, 2021, not March, 2020.

¶ 55: The third sentence should be changed to reflect that Mr. Rodriguez's wisdom teeth were removed in October 2023, not 2022.

¶ 56: The first sentence should be changed to reflect that Mr. Rodriguez's bariatric surgery took place in November 2023, not 2022.  Further, while Mr. Rodriguez has gotten many of his supplements at times, with periods where he does not get them, he has never been given the iron he requires.

¶ 61: The phrase "to help support his family" should be added at the end of the second sentence, to explain why Mr. Rodriguez, did not complete high school, but chose to work right away.  The second sentence should be changed to state that Mr. Rodriguez has not received his G.E.D.  He passed an exam needed to withdraw from high school and take the G.E.D. exam, but he never took the G.E.D. exam, itself.

¶ 73: Mr. Rodriguez does not know of either the listed account or credit card and has never heard of Truist Bank.  He does not believe that either of these are his.

¶ 74: Mr. Rodriguez has never heard of Truist Bank.  He is not aware of any civil judgment against him by this entity.

¶ 76: We object to the statement in the second sentence that "the Court shall impose a sentence in accordance with the applicable guideline range."  The Guidelines are merely advisory and the Court must consider all of the factors enumerated in 18 U.S.C. § 3553(a).  *Rita v. United States*, 551 U.S. 338, 351 (2007).  The Guidelines are only one factor to be considered in determining Mr. Rodriguez' sentence, and are entitled to no greater weight than the other factors outlined in 18 U.S.C. § 3553(a).  *Gall v. United States,* 552 U.S. 38 (2007); *Kimbrough v. United States*, 552 U.S. 85 (2007).  The Court is not required to sentence Mr. Rodriguez within the applicable guideline range.

¶ 77: We object to the statement in the second sentence that "the Court shall impose a sentence in accordance with the applicable guideline range."  The Guidelines are merely advisory and the Court must consider all of the factors enumerated in 18 U.S.C. § 3553(a).  *Rita v. United States*, 551 U.S. 338, 351 (2007).  The Guidelines are only one factor to be considered in determining Mr. Rodriguez' sentence, and are entitled to no greater weight than the other factors outlined in 18 U.S.C. § 3553(a).  *Gall v. United States,* 552 U.S. 38 (2007); *Kimbrough v. United States*, 552 U.S. 85 (2007).  The Court is not bound to sentence Mr. Rodriguez within the applicable guideline range.

If you have any questions or concerns regarding these objections, please feel free to contact me.

Respectfully submitted,

_____/s/_____

Gary M. Kaufman, Esq.
Attorney for Juan Felipe Rodriguez

cc:     Assistant United States Attorney Samuel Rothschild via email

# EXHIBIT 2

MDC BROOKLYN   05-01-24

Dear Judge Castel

I would like to start by thanking you for giving me the opportunity to express all the remorse that I feel for the bad decisions that I took and have me here in this situation today, I would like to tell you a little bit about myself and explain to you how I ended up here.

My father died when I was a kid, growing up for me was all about taking care of my mother and my two sisters, I have allways though that they are my responsability and that I am their support. we have allways been close, they are everything to me. I droped out of school when I was in 11th grade and inmedietly started working as a chef to help out my mom with the house expenses, cooking was a passion for me, but after the years I began to notice that all this work was consuming all of my energy and time and I was barely sharing any time with my family, I have allways see myself as someone with high capacity in bussiness and with alot of vision, I was exhausted and wanted to change my life, first I passed my 214 and 215 license to become a financial advisor wich is the bussiness my family has been for generations.

I started looking for jobs less physical and with more growing opportunities, I was introduced to trading and cryptocurrencies, and saw an opportunity in there, it was something that I liked and understand since the first time it was explained to me. I started meeting new people, I was learning from them, we started working togethe, Everything was great until I found out they had other ways of making money, they worked with drugs too, everything escalated so fast and it was to late when I was involved in their meetings and doing stuff for them. I am not making excuses for my actions, I will face the consequences of my decisions with responsability. I want you to know judge Castel that this feeling of remorse Its not recent and it's not because I am here today, I have been carrying this feeling for years, the years I've been far from my family and that they have suffered because of me, since the day I understood the damage I was doing to this country and how many people I was hurting.

I am very sorry for what I did and I want to apologize to you, to the people of the united states and to my family, In my 30 years

of life this is the first time I am in
trouble and I never though I was going to be
in a situation like this.

I have suffered and learned, now I know how
valuable my freedom and family is, And I ask
God every nigth for another chance to have
my life back, to be able to spend more time
with my sisters and see my niece's growup.
to be close to my mother and be able to
take care of her, and to start a new life with
my fianceé and my dogs, and have kids with
her in the future.

we are humans and we make mistakes but
I believe that like the phoenix, I can be
reborn from the ashes., I want an opportunity
to be a better person everyday that opportunity,
is in your hands your honor.

Thank you for your time and understanding
Sincerely   Juan Rodriguez.

# EXHIBIT 3

Dear Judge Castel,

My name is Arturo Rodriguez, and I am writing to provide a character reference for Juan Felipe Rodriguez, a friend who has become like family to me. I currently live in Florida and work at Miami International Airport as a manager in American Airlines Company.

Although my relationship with Juan has been long-distance, it has been incredibly close. From the moment I started dating his sister about a year ago, he welcomed me into his home as if I were part of his family. His hospitality and warmth made me feel at home every time I visited him at his residence.

Despite the physical distance between us, we have managed to maintain fluid and constant communication thanks to technology. We stay connected through video calls and text messages, allowing us to share experiences and emotions even when we are apart.

Since joining this family recently, I have noticed how incredibly close-knit they are. In this all-female family, Juan is the only man, surrounded by his mother, his fiancé, two sisters, and two nieces. It is inspiring to see how they work together to maintain a strong family unit and unconditionally support each other. As I learn more about this family, I realize how fortunate I am to be a part of it and witness so much love and commitment among its members.

In conclusion, it is essential to take into account all the positive qualities that characterize Juan Rodríguez. His respect for others, transparency in his actions, constant joy, innate generosity and ability to be in society make him an extremely valuable person. Please consider these aspects when making any decision related to Juan.

Thanking you once again for considering my perspective earnestly.

Sincerely,

Arturo Rodriguez.

# EXHIBIT 4

Honorable Judge P. Kevin Castel


United States District Judge
for the Southern District of New York
500 Pearl Street
New York, New York 10007

Respected Honorable Judge:

My name is Clara Yepes, Hospitality and Tourism Administrator, but I am currently working as a Real Estate Agent, based in Miami, FL, and I am the mother of Juan Rodriguez, who is accused of violating laws, for which we are deeply ashamed and steeped in sorrow, because that such a thing would be coming from a young man such as my son Juan – whom we lovingly call Pipe – is hard to believe.  I first beg the forgiveness of God (YHWH) our Father, then to the United States of America, country in which he was born, and where we have lived with great satisfaction and to which we are immensely grateful.

When I tell you respectfully that it is hard to believe, it is because Juan is a young man who was instructed from birth with principles, values, justice, and duties to his family and to society.

As a child and as an adolescent, he was very organized, obedient, and endowed with good judgment. He stayed far away from the things other young people do and use: tattoos, cigarettes, earrings, drugs, alcohol, and any other of those things habitual in the young, of which I am very proud.

Now that he is more mature, I consider him an excellent son, brother, spouse, uncle, cousin, nephew, friend, companion, and neighbor.  He is a responsible man, hardworking, committed, and very quiet. He has never been in any trouble.

He is very humane, sensitive, and generous; he likes to help and do good.

He and we are going through a period that is too difficult and painful, but we have the hope that it will soon pass, and will be a great lesson, not only for him, but for everyone.

I give you huge thanks, Your Honor, for lending an ear to our letters and for becoming aware that we are an upright family, united, and full of love.  We love Pipe, as we call him, and are willing to collaborate and do everything within our reach so no incident will be repeated, and so my son can continue with his normal life, and to express every good thing in his heart, and set an example for society and leave a great legacy.

Once again, thank you for everything.


Clara Yepes
[Signed]

Honorable Juez p. Kevin Castel

United States  District Jude  For the Southern District of New York ,
500 Pearl Street New York,
New York 10007.

Respetado,  honorable Juez:

Mi nombre es Clara Yepes Administradora de hoteleria y turismo, pero en este momento me
desempeño como agente de bienes raices, radicada en Miami Fl y madre de Juan Rodriguez
quien está acusado  de violar la ley  y de lo cuál estamos muy avergonzados y consumidos en
la tristeza  ya que de un joven como es mi hijo Juan llamado cariñosamente pipe, cuesta creer.
Pido perdón primeramente a Dios(YHWH) nuestro padre y  a Los Estados Unidos de América
país en el que nació y hemos vivido con gran satisfacción y estamos inmensamente
agradecidos.
Cuando respetuosamente le digo q cuesta creer, es porque Juan es un joven que desde que
nació fue instruido en principios, valores , justicia y responsabilidades para con su familia y
sociedad .
Niño  y adolescente fue muy organizado, juicioso y obediente ....lejos de usar  y hacer lo que
los demás hacían : tatuajes. cigarrillo, aretes, droga, licor y  cualquier otra cosa  que los
jóvenes acostumbran, de lo cual me siento muy orgullosa .
Ahora más maduro  lo considero un excelente hijo, hermano, conyuge , tío, primo, sobrino,
amigo, compañero y vecino .. es un hombre responsable, trabajador, serio y muy callado,
nunca se ha visto envuelto en ningún problema ...
Es muy humano, sensible, generoso, le gusta ayudar y hacer el bien.
El y nosotros estamos pasando un periodo demasiado difícil y doloroso, pero tenemos la
esperanza de que pronto pasará y será una gran lección  no sólo para el, si no para todos.
Le agradezco inmensamente su señoría prestar oídos a nuestros comunicados y enterarse de
que somos una familia de bien, unida y llena de amor...Que amamos a pipe como le decimos y
estamos dispuestos a  colaborar y a hacer todo lo alcanzable para q no se repita  ningún
incidente y mi hijo pueda continuar con su vida normal y manifestar todo lo bueno que tiene en
su corazón, y ser un gran ejemplo para la sociedad y dejar un gran legado .
Nuevamente gracias por todo.

Clara Yepes

# EXHIBIT 5

Dear Judge Castel,

My name is Cristina Rodriguez, I am an interior decorator and artist located in the city of Miami for 23 years. I am the youngest of 7 siblings, along with my twin. We were born in a home full of love, respect, good education, principles and great values and with parents who, with all the words in the world, I would fall short of describing how beautiful they were with each of their children and grandchildren. They were the family's heroes and they made us all good human beings. They lasted almost 60 years together and created a beautiful, united family full of love, that's what we all are.

I am Juan Felipe's youngest aunt and I can say that since he was born he has always been full of joy and love. In school, he was always a well behaved child, friend, good companion, and one who was generous with everyone as well as a good student. When we meet as a family, which we always try to do very often, he lights up the room every time he walks into it with his presence. When we are not all in reunion, we are constantly greeting each other through messages and family group chats. In our family we are always attentive of each other and always have great communication.

Juan Felipe is an excellent son, brother, cousin, uncle and nephew and for me the best chef as well because he loves to cook and enjoys food, which is why we have always affectionately called him in Spanish "gordo". This is a sweet way of calling someone "chubby", although his nickname does not correlate to his looks we say it with so much love. There is not a single person who knows him who is not enchanted by his way of being kind, respectful, collaborative, but above all with a sense of humor that just thinking about him makes me really smile right now. I love him exactly the way he is. I would change absolutely nothing about him because he is a being full of light, I miss him so much that I can't put into words. I can't wait to hug him again and that God is protecting and blessing him so that everything turns out well for him.

I know he has declared guilty, but I do want to say that I know him by heart and I know that he is not a bad man and he will never be. I can say that he feels very sad, ashamed, sorry and regretful of his actions. As his aunt, I am certain he will never forget this in his life and it will serve as a lesson for him to never make any mistake again in his future. He too will never want to see us how we are now, in absolute sadness. I have no way to explain his behavior of what he did or justify it because that is impossible and something I do not stand by, but I do know that he has never seen a bad example because he has a mother, sisters, cousins and uncles who love him infinitely and we have always given him very good advice for his life. Also, the absence of his father since he was a little boy left a great void in his life, a child going through a death of a parent is something that is not easy and will affect the rest of his life. We all go through stages of immaturity and doing things without thinking about the consequences that come with something terrible. So, I know that he was not in the right place and with the right people to be around. He let himself get carried away somewhere else, forgetting what he learned from family. My heart and soul hurt a lot, I know that he is suffering and asking for forgiveness from all of us and above all to himself for having been fragile in those moments when he has always been taught to be strong and respect the law. I only ask his angels to get him out of this very difficult moment in his life and I know that he will never do absolutely anything that goes against his good will due to his principles and values with which he grew up in. I thank you, Judge Castel, that if you read this letter you do not forget that you are a good man and that God enlightens and guides you as he always does. I know you have a decision to make about my nephew and knowing that he has

nothing on his criminal record and that he is and always will be a good citizen of this great country. Thank you for taking the time to read this Judge Castel prior to passing any judgment.


Yours sincerely,

Cristina Rodriguez

# EXHIBIT 6

Dear Judge Castel

My name is Daniella Rodríguez, and I am Juan's sister. I am 31 years old and have a 5-year-old little girl. Currently, I work at the Miami Airport as a Support Service Agent. In this role, my responsibilities include assisting people with disabilities. Additionally, I also engage in e-commerce activities and occasionally fulfill the roles of a Brand Ambassador and Marketing Manager for AT&T Hispanic Events.

Describing my relationship with my brother is an impossible task, for the depth of my feelings towards him and the significance he holds in my life cannot be fully expressed. We have been inseparable since our earliest memories, supporting each other through every stage of life. For 30 years, he has been my constant companion and confidant, making him the man I love most in this world.

He is an honest, trustworthy, humble person. I can tell you he's the most generous person I've ever come across. It doesn't matter who you are or why you need it, he'll give what he has without a second thought. Now don't get me wrong, he's not perfect. He knows that too. I can assure you though, when it comes to breaking the law, he's sorry for his actions. He's always been very correct in his affairs and super organized too. It's funny because even though I'm a year and a half older than him and the "woman" in our little duo growing up, it was him who taught me to do things the right way! During our time in high school, I would often encourage my brother to skip classes or wait until our grandparents fell asleep so that we could go out and play on the streets. However, he was always the responsible one, never wanting to do anything wrong.

I respectfully submit that my brother has exhibited a remarkable level of maturity throughout this process. I wish to convey we are deeply ashamed and we have sincerely learned from this experience. I kindly request Your Honor to consider my brother's exemplary conduct, his education, and the consistently respectful demeanor he has always displayed.

To conclude, I want you to know that we are hardworking individuals. We have always been driven by our desire to succeed and grow both professionally and emotionally.
No task is too daunting for us, as we have faced adversity from an early age and learned to overcome it. Despite being fatherless, we have never let life's challenges define us. Instead, we have embraced honesty and determination as our guiding principles on the path towards success.

As you can see, I have more than one job, my brother works the same way. However, I want to highlight the qualities that make him truly remarkable. He is a multifunctional individual, possessing intelligence, business acumen, and an innovative mindset. With his diverse skill set and abilities, he has the potential to make significant contributions to society.

I strongly believe that he deserves a second chance to showcase his talents and continue making a positive impact on the people around him.

Sincerely,

Daniella Rodriguez